# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **LACIE MORGAN** on behalf of herself and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**U.S. VISION, INC.** and **USV OPTICAL, INC.,**<br><br>Defendants. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Lacie Morgan, individually and on behalf of all others similarly situated, brings this action against Defendants U.S. Vision, Inc. ("U.S. Vision") and USV Optical Inc. ("USV Optical"). The following allegations are based on Plaintiff's knowledge, investigations of counsel, facts of public record, and information and belief.

## NATURE OF THE ACTION

1.      Plaintiff seeks to hold Defendants responsible for the injuries Defendants inflicted on Plaintiff and more than 700,000 similarly situated persons ("Class Members") due to Defendants' impermissibly inadequate data security, which caused the personal information of Plaintiff and those similarly situated to be exposed to unauthorized access by cybercriminals (the "Data Breach" or "Breach").[1]

---

[1] https://dojmt.gov/wp-content/uploads/Consumer-Notification-Letter-658.pdf (last accessed December 15, 2022); https://www.hipaajournal.com/u-s-vision-subsidiary-reports-hacking-incident-affecting-180000-individuals/ (last accessed December 15, 2022).

2.     The data that Defendants exposed to cybercriminals were highly sensitive. For one, the exposed data included personal identifying information ("PII") like Social Security Numbers, names, addresses, dates of birth, employer identification numbers, employee identification numbers, driver's license numbers, state identification numbers, passport numbers, passwords, PINs, and financial information.

3.     Also, the data that Defendants exposed included personal health information ("PHI") like medical treatments, diagnoses, health insurance information, patient account numbers, prescription/medication information, and billing and claims information.

4.     Upon information and belief, prior to and through May 27, 2021, Defendants obtained Plaintiff's and Class Members' PII and PHI and then maintained that sensitive data in a negligent and/or reckless manner. As evidenced by the Data Breach, Defendants inadequately maintained their network—rendering it easy prey for cybercriminals.

5.     Upon information and belief, the risk of the Data Breach was known to Defendants. Thus, Defendants were on notice that their inadequate data security created a heightened risk of exposure, compromise, and theft.

6.     Then, after the Data Breach, Defendants failed to provide timely notice to the exposed Plaintiff and Class Members—thereby exacerbating their injuries. Defendants did not advise Plaintiff and Class Members of the compromise of their PII and PHI until more than 17 months after Defendants first learned of the Data Breach. Ultimately, Defendants deprived Plaintiff and Class Members of the chance to take speedy measures to protect themselves and mitigate harm. Simply put, Defendants impermissibly left

Plaintiff and Class Members in the dark—thereby causing their injuries to fester and the damage to spread.

7.      Even when Defendants finally notified Plaintiff and Class Members of their exposure, Defendants failed to adequately describe what information was compromised.

8.      Today, the identities and privacy of Plaintiff and Class Members are in jeopardy—all because of Defendants' negligence. Plaintiff and Class Members now suffer from a heightened and imminent risk of fraud and identity theft and must now constantly monitor their financial accounts.

9.      Armed with the PII and PHI stolen in the Data Breach, criminals can commit a litany of crimes. Specifically, criminals can now open new financial accounts in Class Members' names, take out loans using Class Members' identities, use Class Members' names to obtain medical services, use Class Members' health information to craft phishing and other hacking attacks based on Class Members' individual health needs, use Class Members' identities to obtain government benefits, file fraudulent tax returns using Class Members' information, obtain driver's licenses in Class Members' names (but with another person's photograph), and give false information to police during an arrest.

10.      And Plaintiff and Class Members will likely suffer additional financial costs for purchasing necessary credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

11.      Plaintiff and Class Members have suffered—and will continue to suffer— from the loss of the benefit of their bargain, unexpected out-of-pocket expenses, lost or

diminished value of their PII and PHI, emotional distress, and the value of their time reasonably incurred to mitigate the fallout of the Defendants' Data Breach.

12.    Through this action, Plaintiff seeks to remedy these injuries on behalf of themselves and all similarly situated individuals whose PII and PHI were exposed and compromised in the Data Breach.

13.    Plaintiff seeks remedies including, but not limited to, compensatory damages, treble damages, punitive damages, reimbursement of out-of-pocket costs, and injunctive relief—including improvements to Defendants' data security systems, future annual audits, and adequate credit monitoring services funded by Defendants.

14.    Plaintiff brings this action against Defendants and assert claims for: (1) negligence, (2) negligence per se, (3) breach of implied contract, (4) unjust enrichment, and (5) breach of fiduciary duty.

## PARTIES

15.    Plaintiff Lacie Morgan is a resident and citizen of Oklahoma.

16.    Defendant U.S. Vision, Inc. is a retail optical chain that provides eye care and administration services for healthcare providers nationwide with over 350 locations.[2] U.S. Vision is a Delaware corporation with its principal place of business located at 1 Harmon Drive, Blackwood, New Jersey 08012.

---

[2] https://www.usvision.com/about-us/ (last accessed December 15, 2022).

17.    Defendant USV Optical, Inc., a wholly owned subsidiary of Defendant U.S. Vision, Inc., is a Texas Corporation with its principal place of business located at 1 Harmon Drive, Blackwood, New Jersey 08012.

## JURISDICTION AND VENUE

18.    This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action involving more than 100 putative class members and the amount in controversy exceeds $5,000,000, exclusive of interest and costs. And minimal diversity is established because Plaintiff (and many members of the class) are citizens of states different than Defendants'.

19.    This Court has general personal jurisdiction over Defendants because Defendants' principal place of business and headquarters are in Blackwood, New Jersey. Defendants also regularly conduct substantial business in New Jersey.

20.    Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) because substantial part of the events giving rise to the claims emanated from activities within this District, and Defendants conduct substantial business in this District.

## FACTUAL ALLEGATIONS

### *Defendants Collected and Stored the PII and PHI of Plaintiff and Class Members*

21.     Defendants U.S. Vision, Inc. and USV Optical, Inc. provide managed vision care benefits and maintain a retail optical chain that provides eye care and administration services for healthcare providers nationwide with over 350 locations.[3]

22.     Upon information and belief, U.S. Vision, Inc. and USV Optical, Inc. maintain and share the same computer network.

23.     Upon information and belief, Defendants maintain the PII and PHI of patients and customers of their own and of affiliates, such as patients' full names, Social Security Numbers, financial account information and/or credit-card information, dates of birth, prescription information, diagnosis information, treatment information, treatment providers, health insurance information, medical information, and Medicare/Medicaid ID numbers, in the ordinary course of business. These records and this data are stored on Defendants' computer systems.

24.     Upon information and belief, Defendants receive PII and PHI from other individuals and/or organizations that are part of a patient's "circle of care," such as referring physicians, customers' other doctors, customers' health plan(s), close friends, and/or family Members.

---

[3] https://www.usvision.com/about-us/ (last accessed December 15, 2022); https://www.linkedin.com/company/us-vision/about/ (last accessed December 15, 2022).

25.    In 2013, Defendant U.S. Vision acquired Nationwide Vision, which at the time was the largest optical retail chain in Arizona and the 19th largest in the U.S.

26.    Upon information and belief, in addition to an ownership interest, Defendants maintain an active and ongoing business relationship with Nationwide Vision by providing medical practice management and administrative services as a business associate to Nationwide Vision Center, where Plaintiff was a patient. Accordingly, Defendants received Plaintiff's and Class Members' PII and PHI through their relationship and interactions with Nationwide Vision Center.

27.    Upon information and belief, Defendants maintain and share a computer network and data sharing environment with each other and their business associates, including Nationwide Vision Center, where Plaintiff was a patient.

28.    Because of the sensitive and personal nature of the information Defendants acquire and store, Defendants know or reasonably should have known that they store protected PII and PHI and must comply with healthcare industry standards related to data security and all federal and state laws protecting customers' and patients' PII and PHI, and provide adequate notice to customers if their PII or PHI is disclosed without proper authorization.

29.    When Defendants collects this sensitive information, they promise to use reasonable measures to safeguard the PII and PHI from theft and misuse.

30.    Defendants boasts that "U.S. Vision, Inc. [] respects your privacy and are committed to protecting it…."[4] Defendants also declare that "We apply technical, administrative and organizational security measures to protect the data we collect against accidental or unlawful destruction and loss, alteration, unauthorized disclosure or access, in particular, where the processing involves the transmission of data over a network and against other unlawful forms of processing."[5]

31.    Defendants acquired, collected, and stored, and represented that it maintained reasonable security over Plaintiff's and Class Members' PII and PHI.

32.    By obtaining, collecting, receiving, and/or storing Plaintiff's and Class Members' PII and PHI, Defendants assumed legal and equitable duties and knew, or should have known, that it was thereafter responsible for protecting Plaintiff's and Class Members' PII and PHI from unauthorized disclosure.

33.    Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and PHI, including but not limited to, protecting their usernames and passwords, using only strong passwords for their accounts, and refraining from browsing potentially unsafe websites.

34.    Upon information and belief, Plaintiff and Class Members relied on Defendants to keep their PII and PHI confidential and securely maintained, to use this information for business and healthcare purposes only, and to make only authorized disclosures of this information.

---

[4] https://www.usvision.com/privacy-policy/ (last accessed December 15, 2022).
[5] Id.

35.     Defendants could have prevented the Data Breach by properly securing and encrypting and/or more securely encrypting its servers generally, as well as Plaintiff's and Class Members' PII and PHI.

36.     Defendants' negligence in safeguarding Plaintiff's and Class Members' PII and PHI was exacerbated by repeated warnings and alerts directed to protecting and securing sensitive data, as evidenced by the trending data breach attacks in recent years.

37.     The healthcare industry in particular has experienced a large number of high-profile cyberattacks even in just the short period preceding the filing of this Complaint, and cyberattacks, generally, have become increasingly more common. More healthcare data breaches were reported in 2020 than in any other year, showing a 25% increase.[6] Additionally, according to the HIPAA Journal, the largest healthcare data breaches have been reported beginning in April 2021.[7]

38.     In the context of data breaches, healthcare is "by far the most affected industry sector."[8] Further, cybersecurity breaches in the healthcare industry are particularly devastating, given the frequency of such breaches and the fact that healthcare providers maintain highly sensitive and detailed PII.[9] And according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[10]

---

[6] *2020 Healthcare Data Breach Report,* HIPAA JOURNAL (Jan. 19, 2021) https://www.hipaajournal.com/2020-healthcare-data-breach-report-us/.

[7] *April 2021 Healthcare Data Breach Report,* HIPAA JOURNAL (May 18, 2021) https://www.hipaajournal.com/april-2021-healthcare-data-breach-report/.

[8]     Tenable Security Response Team, *Healthcare Security*, TENABLE (Mar. 10, 2021), https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-in-covid-19-era-breaches.

[9] *See id.*

[10] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, SECURITY MAGAZINE (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

39.     Despite the prevalence of public announcements of data breaches and data security compromises, Defendants failed to take appropriate steps to protect Plaintiff's and Class Members' PII and PHI from being compromised.

40.     Defendants failed to properly monitor and log the ingress and egress of network traffic.[11]

41.     Defendants failed to properly monitor and log file access and modifications.[12]

42.     Defendants failed to properly train its employees as to cybersecurity best practices.[13]

43.     Defendants failed to maintain proper staffing and processes for responding to and preventing network intrusions.[14]

44.     Defendants failed to provide fair, reasonable, or adequate computer systems and data security practices to safeguard the PII and PHI of Plaintiff and Class Members.

45.     Defendants failed to timely and accurately disclose that Plaintiff's and Class Members' PII and PHI had been improperly acquired or accessed.

---

[11] *See* https://dojmt.gov/wp-content/uploads/Consumer-Notification-Letter-658.pdf (last accessed December 15, 2022) ("files containing your information may have been viewed and/or taken by the unauthorized individual").

[12] *See id.* at 1-2 ("files containing your information may have been viewed and/or taken by the unauthorized individual").

[13] *See id.* (Data Breach continued until May 17, 2021 even though, "on May 12, 2021, U.S. Vision became aware of suspicious activity involving its computer network.").

[14] *See id.* (Although the Data Breach began on April 20, 2021, Defendants were initially unable to "unable to identify which entities or patients were affected by" the Breach and only with the help of "third-party support" and after 16 months were Defendants able to confirm that Plaintiff's and Class Members' PII and PHI were affected by the Breach.)

46.     Defendants knowingly disregarded standard information security principles, despite obvious risks, by allowing unmonitored and unrestricted access to unsecured PII and PHI.

47.     Defendants failed to provide adequate supervision and oversight of the PII and PHI with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted an unknown third party to gather PII and PHI of Plaintiff and Class Members, misuse the PHI/PII and potentially disclose it to others without consent.

48.     Upon information and belief, Defendants failed to implement sufficient processes to quickly detect and respond to data breaches, security incidents, or intrusions.[15]

49.     Upon information and belief, Defendants failed to encrypt Plaintiff's and Class Members' PII and PHI and monitor user behavior and activity to identify possible threats.[16]

***The Data Breach***

50.     On May 12, 2021, Defendants became aware of suspicious activity on their network environment.[17]

51.     Defendants investigated "the nature and scope of the incident with the assistance of cybersecurity specialists."[18]

---

[15] *See id.* (Although the Data Breach began on April 20, 2021, it was not until "May 12, 2021, [that] U.S. Vision became aware of suspicious activity involving its computer network.").
[16] *See id.* ("files containing your information may have been viewed and/or taken by the unauthorized individual").
[17] *Id.*
[18] *Id.*

52.    Through their investigation, Defendants learned that an unauthorized individual accessed their network intermittently between April 20, 2021 and May 17, 2021.[19]

53.    Although the Data Breach began on April 20, 2021, it was not until May 12, 2021—over three weeks later—that Defendants became aware of suspicious activity on their network.

54.    Further, although Defendants became aware of the Breach on May 12, 2021, the Data Breach continued for another five days and did not end until May 17, 2021. In other words, Defendants were unable to secure their network even after learning of the Dta Breach and, thus, the unauthorized intruder had continued access to Plaintiff's and Class Members' data for an additional five days.

55.    Upon information and belief, Plaintiff's and Class Members' PII and PHI was access, exfiltrated, and stolen in the Breach.

56.    Upon information and belief, Plaintiff's and Class Members' affected PII and PHI was accessible, unencrypted, unprotected, and vulnerable for acquisition and/or exfiltration by unauthorized individuals.

57.    It is likely the Data Breach was targeted at Defendants due to their status as healthcare providers that collect, create, and maintain both PII and PHI.

58.    Defendants admit that the information involved in the Data Breach included: (1) identifying information (such as full name, date of birth, and address); (2) Social

---

[19] *Id.*

Security number, taxpayer identification number, driver's license number, and/or financial account information; (3) medical and/or treatment information (such as medical record number, dates of service, provider name, diagnosis or symptom information, and prescription/medication); (4) health insurance information (such as payor and subscriber/Medicare/Medicaid number); and (5) billing and claims information.[20]

59.    Upon information and belief, the compromised "billing" information includes Plaintiff's and Class Members' financial information.

60.    While Defendants claims to have become aware of the breach as early as May 12, 2021, Defendants did not begin notifying victims of the Data Breach until October 28, 2021, over 17 months later.[21]

61.    Time is of the essence when highly sensitive PII and PHI is subject to unauthorized access and/or acquisition. The disclosed, accessed, and/or acquired PII and PHI of Plaintiff and Class Members is likely available on the Dark Web.[22] Hackers can access and then offer for sale the unencrypted, unredacted PII and PHI to criminals. Plaintiff and Class Members are now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from the possible publication of their PII and PHI, especially their Social Security numbers and sensitive medical information, onto the Dark Web. Plaintiff and Class Members now face a lifetime risk of identity theft, which is heightened here by unauthorized access, disclosure, and/or activity by cybercriminals on

---

[20] *Id.*

[21] *Id.*

[22] *Id.* ("We also insisted that U.S. Vision institute dark web monitoring for any potential data that could have been involved in this incident.")

computer systems containing hundreds of thousands of Social Security numbers and/or specific, sensitive medical information.

62.    Following the Breach and recognizing that each Class Member is now subject to the present and continuing risk of identity theft and fraud, Defendants encouraged Plaintiff and Class Members to "remain vigilant for incidents of potential fraud and identity theft, including regularly reviewing and monitoring your credit reports and account statements."[23] Defendants also encouraged Plaintiff and Class Members to "carefully review credit reports and statements sent from providers as well as your insurance company to ensure that all account activity is valid. Any questionable charges should be promptly reported to the company with which the account is maintained."[24]

63.    Defendants also informed Plaintiff and Class Members that they could "Place a Fraud Alert on Your Credit File," "request a credit freeze from a consumer reporting agency," and "Contact the U.S. Federal Trade Commission" to report unauthorized activity.[25]

64.    Defendants also informed Plaintiff and Class Members that they may contact the three major credit reporting bureaus to request a free copy of "their annual credit report."[26]

65.    Defendants largely put the burden on Plaintiff and Class Members to take measures to protect themselves.

---

[23] *Id.* at 3.
[24] *Id.* at 2.
[25] *Id.* at 2-3.
[26] *Id.* at 3.

66.    Time is a compensable and valuable resource in the United States. According to the U.S. Bureau of Labor Statistics, 55.5% of U.S.-based workers are compensated on an hourly basis, while the other 44.5% are salaried.[27]

67.    According to the U.S. Bureau of Labor Statistics' 2018 American Time Use Survey, American adults have only 36 to 40 hours of "leisure time" outside of work per week;[28] leisure time is defined as time not occupied with work or chores and is "the time equivalent of 'disposable income.'"[29] Usually, this time can be spent at the option and choice of the consumer, however, having been notified of the Data Breach, consumers now have to spend hours of their leisure time self-monitoring their accounts, communicating with financial institutions and government entities, and placing other prophylactic measures in place to attempt to protect themselves.

68.    Plaintiff and Class Members are now deprived of the choice as to how to spend their valuable free hours and seek renumeration for the loss of valuable time as another element of damages.

69.    Upon information and belief, the unauthorized third-party cybercriminals gained access to Plaintiff's and Class Members' PII and PHI with the intent of engaging

---

[27] *Characteristics of minimum wage workers, 2020*, U.S. BUREAU OF LABOR STATISTICS https://www.bls.gov/opub/reports/minimum-wage/2020/home.htm#:~:text=In%202020%2C%2073.3%20million%20workers,wage%20of%20%247.25%20per%20hour (last accessed Oct. 21, 2022); *Average Weekly Wage Data*, U.S. BUREAU OF LABOR STATISTICS, *Average Weekly Wage Data,* https://data.bls.gov/cew/apps/table_maker/v4/table_maker.htm%23type=1&year=2021&qtr=3&own=5&ind=10&supp=0 (last accessed Aug. 2, 2022) (finding that on average, private-sector workers make $1,253 per 40-hour work week.).
[28] Cory Stieg, *You're spending your free time wrong — here's what to do to be happier and more successful*, CNBC https://www.cnbc.com/2019/11/06/how-successful-people-spend-leisure-time-james-wallman.html (Nov. 6, 2019).
[29] *Id.*

in misuse of the PII and PHI, including marketing and selling Plaintiff's and Class Members' PII and PHI.

70.   Defendants also offered credit monitoring services for a period of either 12 or 24 months. Such measures, however, are insufficient to protect Plaintiff and Class Members from the lifetime risks they each now face. As another element of damages, Plaintiff and Class Members seek a sum of money sufficient to provide to Plaintiff and Class Members identity theft protection services for their respective lifetimes.

71.   Defendants had and continues to have obligations created by HIPAA, reasonable industry standards, common law, state statutory law, and its own assurances and representations to keep Plaintiff's and Class Members' PII and PHI confidential and to protect such PII and PHI from unauthorized access.

72.   Defendants' Breach Notice letter, as well as its website notice, both omit the size and scope of the breach. Defendants has demonstrated a pattern of providing inadequate notices and disclosures about the Data Breach.

73.   Plaintiff and the Class Members remain, even today, in the dark regarding what particular data was stolen, the particular ransomware used, and what steps are being taken, if any, to secure their PII and PHI and financial information going forward. Plaintiff and Class Members are left to speculate as to the full impact of the Data Breach and how exactly Defendants intends to enhance its information security systems and monitoring capabilities so as to prevent further breaches.

74.   Plaintiff's and Class Members' PII and PHI and financial information may end up for sale on the dark web, or simply fall into the hands of companies that will use

the detailed PII and PHI and financial information for targeted marketing without the approval of Plaintiff and/or Class Members. Either way, unauthorized individuals can now easily access the PII and PHI and/or financial information of Plaintiff and Class Members.

### Defendants Failed to Comply with FTC Guidelines

75.      According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.[30] To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendants, should employ to protect against the unlawful exposure of PII and PHI.

76.      In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[31] The guidelines explain that businesses should:

      a.      protect the personal customer information that they keep;

      b.      properly dispose of personal information that is no longer needed;

      c.      encrypt information stored on computer networks;

      d.      understand their network's vulnerabilities; and

      e.      implement policies to correct security problems.

---

[30] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (June 2015), https://bit.ly/3uSoYWF (last accessed July 25, 2022).

[31] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://bit.ly/3u9mzre (last accessed July 25, 2022).

77.     The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

78.     The FTC recommends that companies not maintain PII and PHI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[32]

79.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

80.     These FTC enforcement actions include actions against healthcare providers and partners like Defendants. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

---

[32] *See Start with Security*, *supra* note 46.

81.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

**_Defendants Failed to Follow Industry Standards_**

82.    Despite its alleged commitments to securing sensitive patient data, Defendants do not follow industry standard practices in securing patients' PII and PHI.

83.    As shown above, experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

84.    Several best practices have been identified that at a minimum should be implemented by healthcare providers like Defendants, including but not limited to, educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

85.    Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

86.    Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation

PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

87.    Such frameworks are the existing and applicable industry standards in the healthcare industry. And Defendants failed to comply with these accepted standards, thus opening the door to criminals and the Data Breach.

***Defendants Violated HIPAA***

88.    HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[33]

89.    HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII and PHI is properly maintained.[34]

---

[33] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

[34] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

90.     The Data Breach itself resulted from a combination of inadequacies showing Defendants failed to comply with safeguards mandated by HIPAA. Defendants' security failures include, but are not limited to:

a.      Failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b.      Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c.      Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d.      Failing to ensure compliance with HIPAA security standards by Defendants' workforce in violation of 45 C.F.R. § 164.306(a)(4);

e.      Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f.      Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g.   Failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h.   Failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i.   Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

91.   Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrate Defendants failed to comply with safeguards mandated by HIPAA regulations.

***The Experiences and Injuries of Plaintiff***

92.   Plaintiff and Class Members are the current and former patients of Defendants and Defendants' customers. And as a prerequisite of receiving treatment, Defendants and Defendants' customers require their patients—like Plaintiff and Class Members—to disclose their PII and PHI.

93.   Defendants began notifying victims about the Data Breach on or around October 28, 2022—over 17 months after discovering the Breach.

94.     When Defendants finally announced the Data Breach, it deliberately underplayed the Breach's severity and obfuscated the nature of the Breach. Defendants' Breach Notice sent to patients fails to explain how the breach occurred (what security weakness was exploited), what exact data elements of each affected individual were compromised, and the  extent to which those data elements were compromised.

95.     Shortly after and as a result of the Data Breach, Plaintiff Morgan discovered numerous unauthorized charges totaling to approximately $2,000 on her bank account statements. As a result of these unauthorized charges and the Breach in general, Plaintiff was assessed $250-$300 in fees. As a result of these unauthorized charges and the Breach in general, Plaintiff Morgan's credit score was also lowered causing her to be unable to obtain a home loan. As a result of these unauthorized charges and the Breach in general, Plaintiff Morgan was also unable to pay her daughter's medical bills and had to seek financial assistance and obtain two loans. As a result of these unauthorized charges and the Breach in general, Plaintiff Morgan was also unable to pay her credit card bills. As a result of these unauthorized charges and the Breach in general, Plaintiff Morgan had to cancel her debit card and, thus, lost access to her funds while she awaited the arrival of her new card.

96.     Shortly after and as a result of the Data Breach, Plaintiff Morgan suffered from identity theft in 2021. Specifically, Plaintiff Morgan numerous subscriptions were opened in her name and charged to her bank account.

97.     Shortly after and as a result of the Data Breach, Plaintiff Morgan has experienced an increase in spam and suspicious phone calls, texts, and emails.

98.    As a result of these unauthorized charges, identity theft, impacted credit score, and the Breach in general, Plaintiff Morgan was unable to obtain financing for a car in 2021.

99.    On or about November 5, 2022, a full year after Defendants learned of the Data Breach, Plaintiff Morgan received a letter from Defendants, dated October 28, 2022, notifying her that her PII and PHI had been improperly accessed and/or obtained by unauthorized third parties in the Data Breach.

100.    As a result of the Data Breach, Plaintiff Morgan made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, changing her online account passwords, and monitoring her credit information.

101.    Plaintiff Morgan has spent more than 40 hours responding to and dealing with the effects of the Data Breach and will continue to spend valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation.

102.    Plaintiff Morgan suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has experienced anxiety and increased concerns for the loss of her privacy, as well as anxiety over the impact of cybercriminals accessing and using her PII and PHI and/or financial information.

103.    Plaintiff Morgan is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her PII and PHI and financial information, in combination with her name, being placed in the hands of unauthorized third parties/criminals. This injury was worsened by Defendants' 17-month long delay in

informing Plaintiff and Class Members about the Data Breach.

104.    Plaintiff Morgan has a continuing interest in ensuring that her PII and PHI and financial information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

105.    Because of the Data Breach, Defendants inflicted injuries upon Plaintiff and Class Members. And yet, Defendants has done little to provide Plaintiff and the Class Members with relief for the damages they suffered.

106.    All the Plaintiff were injured when Defendants exposed their PII and PHI. Specifically, Defendants injured Plaintiff by compromising, *inter alia*, (1) identifying information (such as full name, date of birth, and address); (2) Social Security number, taxpayer identification number, driver's license number, and/or financial account information; (3) medical and/or treatment information (such as medical record number, dates of service, provider name, diagnosis or symptom information, and prescription/medication); (4) health insurance information (such as payor and subscriber/Medicare/Medicaid number); and (5) billing and claims information.

107.    Plaintiff entrusted their PII and PHI to Defendants and/or one of the entities that contracts services from Defendants. Upon information and belief, Defendants' agreements with those entities require it to protect and maintain the confidentiality of PII and PHI entrusted to it. Thus, Plaintiff had the reasonable expectation and understanding that Defendants would take—*at minimum*—industry standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify them of any data security incidents. After all, Plaintiff would not have

entrusted their PII and PHI to any entity that used Defendants' services had they known that Defendants would not take reasonable steps to safeguard their information.

108.    Plaintiff suffered actual injury from having their PII and PHI compromised in the Data Breach including, but not limited to, (a) damage to and diminution in the value of their PII and PHI—a form of property that Defendants obtained from Plaintiff; (b) violation of their privacy rights; (c) the likely theft of their PII and PHI; (d) fraudulent activity resulting from the Breach; and (e) present and continuing injury arising from the increased risk of additional identity theft and fraud.

109.    As a result of the Data Breach, Plaintiff also suffered emotional distress because of the release of their PII and PHI—which they believed would be protected from unauthorized access and disclosure. Now, Plaintiff suffer from anxiety about unauthorized parties viewing, selling, and/or using their PII and PHI for nefarious purposes like identity theft and fraud.

110.    Plaintiff also suffer anxiety about unauthorized parties viewing, using, and/or publishing their information related to their medical records and prescriptions.

111.    Because of the Data Breach, Plaintiff have spent—and will continue to spend—considerable time and money to try to mitigate and address harms caused by the Data Breach.

*Plaintiff and the Proposed Class Face Significant Risk of Present and Continuing Identity Theft*

112.    Plaintiff and Class Members suffered injury from the misuse of their PII and PHI that can be directly traced to Defendants.

113.    The ramifications of Defendants' failure to keep Plaintiff's and the Class's PII and PHI secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes.

114.    According to experts, one out of four data breach notification recipients become a victim of identity fraud.[35]

115.    As a result of Defendants' failures to prevent—and to timely detect—the Data Breach, Plaintiff and Class Members suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

    a.    The loss of the opportunity to control how their PII and PHI is used;

    b.    The diminution in value of their PII and PHI;

    c.    The compromise and continuing publication of their PII and PHI;

---

[35] *More Than 12 Million Identity Fraud Victims in 2012 According to Latest Javelin Strategy & Research Report*, BUSINESSWIRE (Feb. 20, 2013) https://threatpost.com/study-shows-one-four-who-receive-data-breach-letter-become-fraud-victims-022013/77549/.

d.    Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

e.    Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f.    Delay in receipt of tax refund monies;

g.    Unauthorized use of stolen PII and PHI; and

h.    The continued risk to their PII and PHI, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fails to undertake the appropriate measures to protect the PII and PHI in their possession.

116.    Stolen PII and PHI is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII and PHI can be worth up to $1,000.00 depending on the type of information obtained.[36]

117.    The value of Plaintiff's and the proposed Class's PII and PHI on the black market is considerable. Stolen PII and PHI trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark

---

[36] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017) https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

web" internet websites, making the information publicly available, for a substantial fee of course.

118.    It can take victims years to spot or identify PII and PHI theft, giving criminals plenty of time to milk that information for cash.

119.    One such example of criminals using PII and PHI for profit is the development of "Fullz" packages.[37]

120.    Cyber-criminals can cross-reference two sources of PII and PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

121.    The development of "Fullz" packages means that stolen PII and PHI from the Data Breach can easily be used to link and identify it to Plaintiff'ss and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII and PHI stolen by the cyber-criminals in the Data

---

[37] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record or more on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz", which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records For Sale in Underground Stolen From Texas Life Insurance Firm*, KREBS ON SECURITY, (Sep. 18, 2014) https://krebsonsecurity.com/tag/fullz/.

Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff'ss and other members of the proposed Class's stolen PII and PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

122.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.

123.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Defendants did not rapidly report to Plaintiff and the Class that their PII and PHI had been stolen.

124.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

125.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by the theft of their PII and PHI. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit

reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

126.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII and PHI. To protect themselves, Plaintiff and the Class will need to be remain vigilant against unauthorized data use for years or even decades to come.

127.    The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[38]

128.    The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making.[39] According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on

---

[38] *Commissioner Pamela Jones Harbour: Remarks Before FTC Exploring Privacy Roundtable*, FED. TRADE COMMISSION (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

[39] *Start With Security, A Guide for Business*, FED. TRADE COMMISSION, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Oct. 21, 2022).

networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[40]

129.      According to the FTC, unauthorized PII and PHI disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money, and patience to resolve the fallout.[41] The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act (the "FTCA").

130.      To that end, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. *See In the matter of Lookout Services, Inc.*, No. C-4326, ⁋ 7 (June 15, 2011) ("[Defendant] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ⁋ 7 (Mar. 7, 2006) ("[Defendant] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs,

---

[40] *Id.*

[41] *See Taking Charge, What to Do If Your Identity is Stolen*, FED. TRADE COMMISSION, at 3 (2012), https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen.

computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . ."). These orders, which all preceded the Data Breach, further clarify the measures businesses must take to meet their data security obligations. Defendants thus knew or should have known that its data security protocols were inadequate and were likely to result in the unauthorized access to and/or theft of PII and PHI.

131.    The healthcare industry is a prime target for data breaches.

132.    Over the past several years, data breaches have become alarmingly commonplace. In 2016, the number of data breaches in the U.S. exceeded 1,000, a 40% increase from 2015.[42] The next year, that number increased by nearly 45%.[43] The following year the healthcare sector was the second easiest "mark" among all major sectors and categorically had the most widespread exposure per data breach.[44]

---

[42] *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout*, IDENTITY THEFT RESOURCE CENTER (Jan. 19, 2017), https://bit.ly/30Gew91 [hereinafter "*Data Breaches Increase 40 Percent in 2016*"].

[43] *Data Breaches Up Nearly 45 Percent According to Annual Review by Identity Thegt Resource Center® and CyberScout®*, IDENTITY THEFT RESOURCE CENTER (Jan. 22, 2018), https://bit.ly/3jdGcYR [hereinafter "*Data Breaches Up Nearly 45 Percent*"].

[44] *2018 End-of-Year Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Feb. 20, 2019), https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf.

133.    Data breaches within the healthcare industry continued to increase rapidly. According to the 2019 Healthcare Information and Management Systems Society Cybersecurity Survey, 68% of participating vendors reported having a significant security incident within the last 12 months, with a majority of those being caused by "bad actors."[45]

134.    The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[46] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[47] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[48]

135.    The healthcare industry has "emerged as a primary target because [it sits] on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies to next of kin and credit cards, no

---

[45] *2019 HIMSS Cybersecurity Survey*, HEALTHCARE INFORMATION AND MANAGEMENT SYSTEMS SOCIETY, INC. (Feb. 8, 2019), https://bit.ly/3LJqUr6.

[46] *2018 End-of-Year Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Feb. 20, 2019), https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf.

[47] Elinor Mills, *Study: Medical Identity Theft Is Costly for Victims*, CNET (Mar. 3, 2010), https://cnet.co/33uiV0v.

[48] *Id.*

other organization, including credit bureaus, ha[s] so much monetizable information stored in their data centers."[49]

136.    Charged with handling highly sensitive PII and PHI including healthcare information, financial information, and insurance information, Defendants knew or should have known the importance of safeguarding the PII and PHI that was entrusted to it. Defendants also knew or should have known of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on Defendants' customers' patients as a result of a breach. Defendants nevertheless failed to take adequate cybersecurity measures to prevent the Data Breach from occurring.

137.    Defendants disclosed the PII and PHI of Plaintiff and members of the proposed Class for criminals to use in the conduct of criminal activity. Specifically, Defendants opened, disclosed, and exposed the PII and PHI of Plaintiff and members of the proposed Class to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII and PHI.

138.    Defendants' use of outdated and insecure computer systems and software that are easy to hack, and its failure to maintain adequate security measures and an up-to-date technology security strategy, demonstrates a willful and conscious disregard for

---

[49] Eyal Benishti, *How to Safeguard Hospital Data from Email Spoofing Attacks*, INSIDE DIGITAL HEALTH (Apr. 4, 2019), https://bit.ly/3x6fz08.

privacy, and has exposed the PII and PHI of Plaintiff and potentially thousands of members of the proposed Class to unscrupulous operators, con artists, and outright criminals.

139.    Defendants' failure to properly notify Plaintiff and members of the proposed Class of the Data Breach exacerbated Plaintiff's and members of the proposed Class's injury by depriving them of the earliest ability to take appropriate measures to protect their PII and PHI and take other necessary steps to mitigate the harm caused by the Data Breach.

## CLASS ACTION ALLEGATIONS

140.    Plaintiff bring this action on behalf of herself and on behalf of all other persons similarly situated ("the Class") under Fed. R. Civ. P. 23(b)(2), 23(b)(3), and 23(c)(4).

141.    Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

> All persons residing in the United States whose PII or PHI was impacted by the Data Breach—including all persons that Defendants sent a notice of the Data Breach to (the "Class").

142.    The Classes defined above is readily ascertainable from information in Defendants' possession. Thus, such identification of Class Members will be reliable and administratively feasible.

143.    Excluded from the Class are: (1) any judge or magistrate presiding over this action and members of their families; (2) Defendant, Defendants' subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendants or their parent has a controlling interest, and their current or former officers and directors; (3)

persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; (6) members of the jury; and (7) the legal representatives, successors, and assigns of any such excluded persons.

144.   Plaintiff reserves the right to amend or modify the Class definition—including potential Subclasses—as this case progresses.

145.   The Class proposed by Plaintiff satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23.

146.   **Numerosity**. The Class Members are numerous such that joinder is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Class consists of the approximately 180,000 individuals whose PII and PHI were compromised by Defendants' Data Breach.

147.   **Commonality**. There are many questions of law and fact common to the Class. And these common questions predominate over any individualized questions of individual Class Members. These common questions of law and fact include, without limitation:

       a.     If Defendants unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' PII and PHI;

       b.     If Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    If Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, *e.g.*, HIPAA;

d.    If Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

e.    If Defendants owed a duty to Class Members to safeguard their PII and PHI;

f.    If Defendants breached its duty to Class Members to safeguard their PII and PHI;

g.    If Defendants knew or should have known that its data security systems and monitoring processes were deficient;

h.    If Defendants should have discovered the Data Breach earlier;

i.    If Defendants took reasonable measures to determine the extent of the Data Breach after it was discovered;

j.    If Defendants' delay in informing Plaintiff and Class Members of the Data Breach was unreasonable;

k.    If Defendants' method of informing Plaintiff and Class Members of the Data Breach was unreasonable;

l.    If Defendants' conduct was negligent;

m.    If Plaintiff and Class Members were injured as a proximate cause or result of the Data Breach;

n.   If Plaintiff and Class Members suffered legally cognizable damages as a result of Defendants' misconduct;

o.   If Defendants breached implied contracts with Plaintiff and Class Members;

p.   If Defendants was unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

q.   If Defendants failed to provide notice of the Data Breach in a timely manner, and;

r.   If Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

148.   **Typicality**. Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the Data Breach. Moreover, all Plaintiff and Class Members were subjected to Defendants' uniformly illegal and impermissible conduct.

149.   **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating complex class actions. Plaintiff have no interests that conflict with, or are antagonistic to, those of the Class.

150.   **Predominance**. Defendants has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff and Class Members' data was stored on the same computer system and unlawfully exposed in the same way. The common

issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

151. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources, the parties' resources, and protects the rights of each Class Member.

152. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

153. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

154. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of

which would advance the disposition of this matter and the parties' interests therein. Such particular issues include those set forth above.

155.    Defendants has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

## FIRST CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiff and the Class)

156.    Plaintiff re-allege and incorporate by reference paragraphs 1-139 of the Complaint as if fully set forth herein.

157.    Defendants required its customers, patients, and affiliates to submit Plaintiff and Class Members non-public PII and PHI to receive Defendants' services.

158.    By collecting and storing this data in their computer system and network, and sharing it and using it for commercial gain, Defendants owed a duty of care to use reasonable means to secure and safeguard their computer system—and Plaintiff's and Class Members' PII and PHI held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendants' duty included a responsibility to implement processes so they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

159.    The risk that unauthorized persons would attempt to gain access to the PII and PHI and misuse it was foreseeable. Given that Defendants hold vast amounts of PII

and PHI, it was inevitable that unauthorized individuals would at some point try to access Defendants' databases of PII and PHI.

160.    After all, PII and PHI is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII and PHI of Plaintiff and Class Members. Thus, Defendants knew, or should have known, the importance of exercising reasonable care in handling the PII and PHI entrusted to them.

161.    Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the PII and PHI.

162.    Defendants' duty of care to use reasonable security measures arose because of the special relationship that existed between Defendants and patients, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendants was in a superior position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

163.    Defendants failed to take appropriate measures to protect the PII and PHI of Plaintiff and the Class. Defendants are morally culpable, given the prominence of security breaches in the healthcare industry. Any purported safeguards that Defendants had in place were wholly inadequate.

164.    Defendants breached their duty to exercise reasonable care in safeguarding and protecting Plaintiff's and the Class members' PII and PHI by failing to adopt, implement, and maintain adequate security measures to safeguard that information, despite

known data breaches in the healthcare industry, and allowing unauthorized access to Plaintiff's and the other Class Members' PII and PHI.

165.    The failure of Defendants to comply with industry and federal regulations evinces Defendants' negligence in failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII and PHI.

166.    But for Defendants' wrongful and negligent breach of their duties to Plaintiff and the Classes, patients' PII and PHI would not have been compromised, stolen, and viewed by unauthorized persons. Defendants' negligence was a direct and legal cause of the theft of the PII and PHI of Plaintiff and the Classes and all resulting damages.

167.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendants' failure to exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class members' PII and PHI. Defendants knew or should have known that their systems and technologies for processing and securing the PII and PHI of Plaintiff and the Classes had security vulnerabilities.

168.    As a result of this misconduct by Defendants, the PII, PHI, and other sensitive information of Plaintiff and the Classes was compromised, placing them at a greater risk of identity theft and their PII and PHI being disclosed to third parties without the consent of Plaintiff and the Classes.

## SECOND CAUSE OF ACTION
### Negligence *Per Se*
### (On Behalf of Plaintiff and the Class)

169.     Plaintiff re-alleges and incorporates by reference paragraphs 1-139 of the Complaint as if fully set forth herein.

170.     Under HIPAA, Defendants had a duty to use reasonable security measures to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information."[50] Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.[51]

171.     Moreover, under HIPAA, Defendants had a duty to render the electronic PII and PHI that it maintained as unusable, unreadable, or indecipherable to unauthorized individuals. Specifically, the HIPAA Security Rule requires "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key."[52]

172.     Plaintiff and Class Members are within the class of persons that the HIPAA was intended to protect. And the injuries that Defendants inflicted on Plaintiff and Class Members are precisely the harms that HIPAA guards against. After all, the Federal Health and Human Services' Office for Civil Rights ("OCR") has pursued enforcement actions against businesses which—because of their failure to employ reasonable data security

---

[50] 45 C.F.R. § 164.530(c)(1).
[51] *Id*.
[52] 45 C.F.R. § 164.304 (defining encryption).

measures for PHI— caused the very same injuries that Defendants inflicted upon Plaintiff and Class Members.

173.     Under § 17932 of the Health Information Technology for Economic and Clinical Health Act ("HITECH"), Defendants have duty to promptly notify "without unreasonable delay and in no case later than 60 calendar days after the discovery of a breach" the respective covered entities and affected persons so that the entities and persons can take action to protect themselves.[53]

174.     Moreover, § 17932(a) of HITECH states that, "[a] covered entity that accesses, maintains, retains, modifies, records, stores, destroys, or otherwise holds, uses, or discloses unsecured protected health information (as defined in subsection (h)(1)) shall, in the case of a breach of such information that is discovered by the covered entity, notify each individual whose unsecured protected health information has been, or is reasonably believed by the covered entity to have been, accessed, acquired, or disclosed as a result of such breach."

175.     And § 17932(b) of HITECH states that, "[a] business associate of a covered entity that accesses, maintains, retains, modifies, records, stores, destroys, or otherwise holds, uses, or discloses unsecured protected health information shall, following the discovery of a breach of such information, notify the covered entity of such breach. Such notice shall include the identification of each individual whose unsecured protected health

---

[53] 42 U.S.C.A. § 17932(d)(1).

information has been or is reasonably believed by the business associate to have been, accessed, acquired, or disclosed during such breach."

176.    Under the Federal Trade Commission Act, Defendants had a duty to employ reasonable security measures. Specifically, this statute prohibits "unfair . . . practices in or affecting commerce," including (as interpreted and enforced by the FTC) the unfair practice of failing to use reasonable measures to protect confidential data.[54]

177.    Moreover, Plaintiff and Class Members' injuries are precisely the type of injuries that the FTCA guards against. After all, the FTC has pursued numerous enforcement actions against businesses that—because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices—caused the very same injuries that Defendants inflicted upon Plaintiff and Class Members.

178.    Defendants' duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential PII and PHI.

179.    Defendants owed Plaintiff and Class Members a duty to notify them within a reasonable time frame of any breach to their PII and PHI. Defendants also owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. This duty is necessary for Plaintiff and Class Members to take appropriate measures to protect their PII and PHI, to be vigilant in the face of an

---

[54] 15 U.S.C. § 45.

increased risk of harm, and to take other necessary steps in an effort to mitigate the fallout of Defendants' Data Breach.

180.    Defendants owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from its inadequate security protocols. After all, Defendants actively sought and obtained the PII and PHI of Plaintiff and Class Members.

181.    Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' PII and PHI. And but for Defendants' negligence, Plaintiff and Class Members would not have been injured. The specific negligent acts and omissions committed by Defendants include, but are not limited to:

a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII and PHI;

b.  Failing to comply with—and thus violating—HIPAA and its regulations;

c.  Failing to comply with—and thus violating—HITECH and its regulations;

d.  Failing to comply with—and thus violating—FTCA and its regulations;

e.  Failing to adequately monitor the security of its networks and systems;

f.  Failing to have in place mitigation policies and procedures;

g.  Allowing unauthorized access to Class Members' PII and PHI;

h.  Failing to detect in a timely manner that Class Members' PII and PHI had been compromised; and

i.   Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

182.    It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' PII and PHI would result in injury to Class Members. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry. It was therefore foreseeable that the failure to adequately safeguard Class Members' PII and PHI would result in one or more types of injuries to Class Members.

183.    Simply put, Defendants' negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injuries-in-fact and damages. These injuries include, but are not limited to, the theft of their PII and PHI by criminals, improper disclosure of their PII and PHI, lost benefit of their bargain, lost value of their PII and PHI, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants' negligence. Moreover, injuries-in-fact and damages are ongoing, imminent, and immediate.

184.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

185.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *e.g.,* (1) strengthen their data security systems and monitoring procedures; (2) submit to future annual audits of those systems and monitoring procedures; and (3) continue to provide adequate credit monitoring to all Class Members for the remainders of their lives.

## <u>THIRD CAUSE OF ACTION</u>
### Breach of Implied Contract
### (On behalf of the Plaintiff and the Class)

186.     Plaintiff re-alleges and incorporates by reference paragraphs 1-139 of the Complaint as if fully set forth herein.

187.     Plaintiff and the Class Members entered into implied contracts with Defendants under which Defendants agreed to safeguard and protect their PII and PHI and to timely and accurately notify Plaintiff and Class Members that their information had been breached and compromised.

188.     Upon information and belief, Nationwide Vision is an agent of Defendants.

189.     Plaintiff and the Class were required to and delivered their PII and PHI to Defendants as part of the process of obtaining services provided by Defendant. Plaintiff and Class Members paid money, or money was paid on their behalf, to Defendants in exchange for services.

190.     Defendants accepted possession of Plaintiff's and Class Members' PII and PHI for the purpose of providing services or Plaintiff and Class Members.

191.     In its written policies, Defendants expressly and impliedly promised to Plaintiff and Class Members that it would only disclose protected information and other PII and PHI under certain circumstances, none of which related to a Data Breach as occurred in this matter.

192.     The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed under HIPAA or other state of federal regulations. The

additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

193.    The implied promises include but are not limited to: (1) taking steps to ensure that any agents who are granted access to PII and PHI also protect the confidentiality of that data; (2) taking steps to ensure that the information that is placed in the control of its agents is restricted and limited to achieve an authorized medical purpose; (3) restricting access to qualified and trained agents; (4) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (5) applying or requiring proper encryption; (6) multifactor authentication for access; and (7)  other steps to protect against foreseeable data breaches.

194.    Based on the implicit understanding, Plaintiff and Class Members accepted Defendants' offers and provided Defendants with their PII and PHI directly and via their healthcare providers.

195.    Plaintiff and Class Members would not have permitted their PII and PHI to be collected and stored by Defendants had they known that Defendants would not safeguard their PII and PHI, as promised, or provide timely notice of a data breach.

196.    Plaintiff and Class Members fully performed their obligations under their implied contracts with Defendants.

197.    Defendants breached the implied contracts by failing to safeguard Plaintiff's and Class Members' PII and PHI and by failing to provide them with timely and accurate notice of the Data Breach.

198.    The losses and damages Plaintiff and Class Members sustained (as described above) were the direct and proximate result of Defendants' breach of its implied contracts with Plaintiff and Class Members.

### FOURTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

199.    Plaintiff re-alleges and incorporates by reference paragraphs 1-165 of the Complaint as if fully set forth herein.

200.    This cause of action is plead in the alternative to the breach of implied contract theory.

201.    Plaintiff and Class Members conferred a monetary benefit on Defendants, by paying money for healthcare services that relied on Defendants to render certain services, a portion of which was intended to have been used by Defendants for data security measures to secure Plaintiff and Class Members' PII and PHI. Plaintiff and Class Members further conferred a benefit on Defendants by entrusting their PII and PHI to Defendants from which Defendants derived profits.

202.    Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff and Class Members' PII and PHI. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide adequate security.

203.     Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

204.     Defendants acquired the monetary benefit, PII, and PHI through inequitable means in that Defendants failed to disclose the inadequate security practices, previously alleged, and failed to maintain adequate data security.

205.     If Plaintiff and Class Members knew that Defendants had not secured their PII and PHI, they would not have agreed to give their money—or disclosed their data—to Defendants or Defendants' customers.

206.     Plaintiff and Class Members have no adequate remedy at law.

207.     As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered—and will continue to suffer—a host of injuries, including but not limited to: (1) actual identity theft; (2) the loss of the opportunity to determine how their PII and PHI is used; (3) the compromise, publication, and/or theft of their PII and PHI; (4) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII and PHI; (5) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (6) the continued risk to their PII and PHI, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake

appropriate and adequate measures to protect the PII and PHI in their possession; and (7) future expenditures of time, effort, and money that will be spent trying to prevent, detect, contest, and repair the impact of Defendants' Data Breach.

208.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members suffered—and will continue to suffer—other forms of injury and/or harm.

209.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from Plaintiff and Class Members.

## FOURTH CAUSE OF ACTION

### Breach of Fiduciary Duty
### (On Behalf of Plaintiff and the Class)

210.    Plaintiff re-alleges and incorporates by reference paragraphs 1-139 of the Complaint as if fully set forth herein.

211.    A relationship existed between Plaintiff, the Class Members, and Defendants, which arose from Defendants' acceptance of Plaintiff's and the Class Members' PII and PHI and Defendants' representations of its commitment to protect said PII and PHI.

212.    The interests of public policy mandates that a fiduciary duty is imputed given Defendants' acceptance of Plaintiff's and the Class Members' PII and PHI and Defendants' representations of its commitment to protect said PII and PHI.

213.    Defendants breached the fiduciary duty that they owed to Plaintiff and Class Members because Defendants failed to act with the utmost good faith, fairness, honesty,

the highest degree of loyalty, ultimately failed to protect the PII and PHI of Plaintiff and Class Members.

214.     Defendants' breach of fiduciary duty was a legal cause of damage to Plaintiff and Class Members.

215.     But for Defendants' breach of fiduciary duty, the damage to Plaintiff and Class Members would not have occurred.

216.     Defendants' breach of fiduciary duty contributed substantially to producing the damage to Plaintiff and Class Members.

217.     As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiff and Class Members are entitled to and demand actual, consequential, nominal damages, and injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff, on behalf of themselves and all others similarly situated, request the following relief:

A.     An Order certifying this action as a class action and appointing Plaintiff as Class representative and the undersigned as Class counsel;

B.     A mandatory injunction directing Defendants to adequately safeguard the PII and PHI of Plaintiff and the Class hereinafter by implementing improved security procedures and measures, including but not limited to an Order:

   i.     prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

   ii.     requiring Defendants to protect, including through encryption, all

data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii.    requiring Defendants to delete and purge the PII and PHI of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.    requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' PII and PHI;

v.    requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis;

vi.    prohibiting Defendants from maintaining Plaintiff's and Class Members' PII and PHI on a cloud-based database until proper safeguards and processes are implemented;

vii.    requiring Defendants to segment data by creating firewalls and access controls so that, if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

viii.   requiring Defendants to conduct regular database scanning and securing checks;

ix.   requiring Defendants to monitor ingress and egress of all network traffic;

x.   requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII and PHI, as well as protecting the PII and PHI of Plaintiff and Class Members;

xi.   requiring Defendants to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xii.   requiring Defendants to implement, maintain, review, and revise as necessary a threat management program to appropriately monitor Defendants' networks for internal and external threats, and assess whether monitoring tools are properly configured, tested, and updated; and

xiii.   requiring Defendants to meaningfully educate all Class Members

about the threats that they face because of the loss of its confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves.

C.   A mandatory injunction requiring that Defendants provide notice to each member of the Class relating to the full nature and extent of the Data Breach and the disclosure of PII and PHI to unauthorized persons;

D.   Enjoining Defendants from further deceptive practices and making untrue statements about the Data Breach and the stolen PII and PHI;

E.   An award of damages, including actual, nominal, consequential damages, and punitive, as allowed by law in an amount to be determined;

F.   An award of attorneys' fees, costs, and litigation expenses, as allowed by law;

G.   An award of pre- and post-judgment interest, costs, attorneys' fees, expenses, and interest as permitted by law;

H.   Granting the Plaintiff and the Class leave to amend this Complaint to conform to the evidence produced at trial;

I.   For all other Orders, findings, and determinations identified and sought in this Complaint; and

J.   Such other and further relief as this court may deem just and proper.

## **JURY TRIAL DEMANDED**

Under Federal Rule of Civil Procedure 38(b), Plaintiff demand a trial by jury for any and all issues in this action so triable as of right.

Dated: December 23, 2022          Respectfully Submitted,

*/s/ Gamaliel Delgado*
GAMALIEL DELGADO
**MORGAN & MORGAN**
350 Fifth Avenue, Suite 6705
New York, NY 10118
917-344-7031
917-344-7056 (fax)
gdelgado@forthepeople.com

JEAN S. MARTIN
*(Pro Hac Vice application forthcoming)*
FRANCESCA KESTER
*(Pro Hac Vice application forthcoming)*
MORGAN & MORGAN
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 559-4908
jeanmartin@ForThePeople.com
fkester@ForThePeople.com

***Counsel for Plaintiff and the Class***